**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CUMULUS MEDIA INC., *et al.*,[1] | ) Case No. 26-90346 (ARP) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF FRANCISCO J. LOPEZ-BALBOA IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Francisco J. Lopez-Balboa, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Executive Vice President and Chief Financial Officer of Cumulus Media Inc. and certain of its affiliates.  Cumulus Media Inc. and its debtor affiliates are debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors", and together with their non-debtor affiliates the "Company" or "Cumulus Media").

2.      I have served as Executive Vice President and Chief Financial Officer of Cumulus Media Inc. since March 2020.  Prior to joining Cumulus Media, I served as Executive Vice President and Chief Financial Officer of Univision Communications Inc. from 2015 to 2018. Before Univision, I spent more than two decades as an investment banker focused on Telecom, Media and Technology ("TMT") companies, including as a Managing Director at Goldman, Sachs & Co., where I last led the firm's TMT Investment Grade Debt Financing business.  I began my

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.veritaglobal.net/cumulusmedia.  The Debtors' service address for purposes of these chapter 11 cases is:  780 Johnson Ferry Road, N.E., Suite 500, Atlanta, Georgia 30342.

career in the Investment Banking Capital Markets Group at Merrill Lynch & Co.  I hold an MBA from Harvard University and a Bachelor of Arts in Economics from Columbia University.

3.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").   As Executive Vice President and Chief Financial Officer, I have independently reviewed, have become generally familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, businesses, financial affairs, books and records, and the circumstances leading up to these chapter 11 cases.  As discussed in further detail below, these chapter 11 cases were necessitated by, among other things, persistent industry-wide declines in core radio broadcast advertising revenues, inflationary cost pressures, elevated interest expense that strained liquidity, and the need to address upcoming funded debt obligations and an unsustainable capital structure.  A list of the Debtors is attached as **Exhibit A**, and a chart reflecting the Debtors' corporate structure is attached as **Exhibit B**.

4.       I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions (the "Petitions"), and the Debtors' related requests for initial relief in the motions and applications filed contemporaneously herewith (the "First Day Motions"), as well as to assist the Court and parties in interest in understanding the circumstances that led the Debtors to commence these chapter 11 cases.  To that end, this Declaration provides background information about the Company's corporate history, business operations, capital structure, and recent challenges, and supports the Debtors' Petitions and the relief requested in the First Day Motions.

5.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management

and other personnel, my discussions with the Debtors' non-legal advisors, my review of business records maintained in the regular course of business and other relevant documents, or my opinion based on my professional experience. In making this Declaration, I have relied in part on information and materials that the Debtors and the Debtors' non-legal advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration. Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is accurate to the best of my knowledge. If called to testify, I could and would testify competently as to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

### Preliminary Statement[2]

6.     Cumulus Media is a leading audio-first media company that delivers premium content through 394 owned-and-operated radio stations across 84 markets and national audio platforms, including the Westwood One network and the Cumulus Podcast Network. It also operates one of the largest U.S. streaming audio advertising networks and offers a suite of local digital marketing services. The Company generates revenue primarily from the sale of broadcast radio advertising, supplemented by digital advertising and other ancillary revenue streams. As of the Petition Date, the Debtors employ approximately 3,000 people, including approximately 2,000 full-time employees.

7.     These chapter 11 cases are the product of sustained challenges in the broadcast radio industry and broader macroeconomic pressures that, notwithstanding significant strategic actions by the Company, have reduced advertising demand and constrained liquidity. Over

---

[2]     Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms elsewhere in this Declaration.

multiple years, core revenues across the industry in which the Company operates have been affected by competition from digital audio and streaming platforms, shifts toward programmatic and performance-based ad buying, and recurring annual declines in radio listenership, which were exacerbated by pandemic-era behavioral changes and the failure of audience drivetime metrics and associated audience-based advertiser demands to rebound post-COVID.   At the same time, persistent inflation increased operating costs, and elevated benchmark interest rates materially increased cash interest expense, further pressuring free cash flow and limiting financial flexibility.

8.      To address ongoing challenges, the Company undertook a multi-year sequence of operational and strategic initiatives to strengthen its balance sheet, extend maturities, and preserve liquidity.   Among other steps, the Company advanced operational initiatives to increase and diversify revenue sources, including accelerating investment in its digital platforms such as the Cumulus Podcast Network and local digital marketing services.   In parallel, the Company reduced gross debt by monetizing non-core assets and executing opportunistic refinancings, resulting in an approximately 30% reduction in funded indebtedness since the end of 2019.   By early 2024, it was clear that a comprehensive refinancing was needed to proactively address upcoming maturities under the Company's debt facilities.   In May 2024, the Company completed exchange transactions pursuant to a transaction support agreement with its secured lenders that converted 97% of its existing first-lien term loans maturing in 2026 into new first-lien term loans maturing in 2029 and 94% of its existing senior notes due 2026 into new senior secured notes due 2029.   While these transactions extended the maturities applicable to nearly all funded indebtedness previously scheduled to mature in 2026, certain holders did not participate, leaving a small portion of 2026 maturities unaddressed.

9.     Although the 2024 exchange transactions provided substantial maturity extensions, persistent industry-wide revenue declines and various macroeconomic pressures, including high interest rates and inflation, continued to offset the benefits of the Company's strategic initiatives, creating additional liquidity pressure through 2024 and 2025.  To mitigate these pressures, the Debtors implemented operational measures throughout the second half of 2024 and 2025 to preserve liquidity, including incremental fixed-cost reductions, renegotiation of key contracts, streamlining of legacy operations, intensified working-capital discipline, targeted reductions in non-essential capital expenditures, and selective draws under the ABL Facility (as defined below) to bridge periods of revenue volatility.  The Company also pursued initiatives intended to improve advertising monetization effectiveness and moderate certain third-party costs.  Despite these measures, ongoing industry revenue declines and macroeconomic headwinds continued to constrain liquidity and free cash flow.

10.     The Company's financial outlook was further exacerbated by the implementation of a new network tying policy by Nielsen Audio ("Nielsen"), the radio broadcast industry's principal ratings service, in late 2024.  Nielsen is the exclusive provider of national radio ratings data, which network broadcasters use to sell advertising inventory and the dominant provider of local radio ratings data used by local broadcasters to sell their advertising inventory.  Nielsen's new policy forced any customer that owns both a national network and local radio stations to purchase Nielsen's local radio ratings data in all local markets in which the applicable customer operates to access a complete version of Nielsen's national radio data.  The policy (1) forces Cumulus to buy Nielsen local ratings data products in markets where such products are uneconomic for the Company in order to buy the national ratings data product, which is critical to selling national advertising and (2) prevents Cumulus from purchasing only those local Nielsen

products that generate positive returns and dropping products that do not.  While the Company was initially hopeful that an economic agreement (*i.e.*, one in which the Company was not burdened by the new tying policy) could be reached consensually without litigation, Nielsen ultimately was unwilling to deviate from its new policy. Consequently, the Company filed a complaint against Nielsen in October 2025 in federal court in the Southern District of New York. As discussed in greater detail below, Nielsen's tying policy would either result in the Company losing access to the complete national ratings data product because it chose to resist Nielsen's pressure to buy unwanted local market ratings data, thereby threatening the viability of its network advertising business or, if it succumbed to the tying policy, being forced to shoulder the burden of material costs associated with products that the Company attempted to cease engaging with (on account of the existing cost structure being untenable), endangering the financial stability of the entire Company.

11.    While the Company was successful in obtaining a preliminary injunction against the network tying policy, the Second Circuit Court of Appeals has since issued a stay of that preliminary injunction pending Nielsen's appeal of the decision, prolonging uncertainty and delaying intermediate relief.

12.    The persistent and industry-wide revenue declines, inflationary cost pressures, elevated interest expense, and looming maturities described above, as well as the situation with Nielsen, have left the Company with limited transaction alternatives outside of a comprehensive restructuring transaction.

13.    As a result of these various pressures, in the last quarter of 2025, the Company, with the assistance of its advisors, began to explore various strategic alternatives and potential liquidity-enhancing transactions.

14.     After considering the available options, the Debtors and their advisors determined that the best path forward was to implement a comprehensive recapitalization transaction, either out-of-court or through the filing of prepackaged chapter 11 cases.  Beginning in Q4 2025, the Company and its advisors advanced discussions regarding the terms of a comprehensive restructuring transaction with its key stakeholders, including the ABL Agent and an ad hoc group of secured lenders represented by Gibson, Dunn & Crutcher LLP, as counsel, and Guggenheim Securities, LLC, as investment banker (the "Ad Hoc Group") .  While the Company originally aimed to complete the transactions on an out-of-court basis, given ongoing industry pressures, the Company began to pivot to preparing for a prepackaged chapter 11 filing in early 2026.  The Debtors determined that a prepackaged filing anchored by an agreement with their key stakeholders on the terms of a comprehensive restructuring would avoid a value destructive freefall, minimize execution risk, reduce cost and disruption, and was in the best interests of all stakeholders.  In connection with the Company's assessment of potential transactions, on January 28, 2026, the board of directors of Cumulus Media Inc. (the "Board") appointed Ms. Carol Flaton as an independent director and formed special restructuring and investigation committees to assist with the evaluation of restructuring alternatives and conduct an independent review of potential claims, respectively.

15.     Following significant arm's-length negotiations, on March 4, 2026, the Debtors and the members of the Ad Hoc Group entered into that certain Restructuring Support Agreement (the "Restructuring Support Agreement"), attached hereto as **Exhibit C**, which contemplates an in-court restructuring of the Debtors through a prepackaged chapter 11 plan.  The Restructuring Support Agreement provides for a substantial deleveraging of the Debtors' balance sheet by approximately $592 million, a reduction in annual cash interest expense of approximately $49

million, and a streamlined capital structure that positions the reorganized Company to compete effectively and pursue future strategic opportunities.

16.     In parallel with the negotiation of the Restructuring Support Agreement, the Debtors also engaged in discussions with the ABL Parties in an effort to develop a broadly supported and comprehensive series of restructuring transactions.  The Debtors and the ABL Parties ultimately entered into a commitment letter that provides for up to $100 million in aggregate commitments under an amended and restated ABL Facility (the "ABL Commitment Letter").   The ABL Parties and the Ad Hoc Group have also consented to the Debtors' use of Cash Collateral during the chapter 11 cases pursuant to a negotiated interim cash collateral order, thereby avoiding costly and distracting litigation at the outset of these cases.

17.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized the rest of this Declaration as follows:

- **Part I** provides a general overview of the Company's business and operations;

- **Part II** provides an overview of the Company's prepetition capital structure;

- **Part III** describes the events leading to the filing of the chapter 11 cases and the Company's prepetition restructuring efforts; and

- **Part IV** summarizes the relief requested in the First Day Motions.

I.     **Overview of the Company's Business and Operations**

     A.     **Overview**

18.     The Debtors comprise the operating business of the Company.  Cumulus Media is a media company delivering premium audio content to a quarter of a billion people every month and providing highly efficient traditional and digital media solutions to tens of thousands of

companies.  Cumulus Media engages listeners with high-quality local programming through 394

owned-and-operated radio stations across 84 markets; delivers nationally-syndicated sports, news,

talk, and entertainment programming from iconic brands including the NFL, the NCAA, the

Masters,  US Soccer, AP News, and the Academy of Country Music Awards, and many other

world-class partners across more than 7,800 affiliated stations through Westwood One, a leading

national audio network in America; and inspires listeners through the Cumulus Podcast Network,

an established and influential platform for original podcasts that are smart, entertaining, and

thought provoking.  Cumulus Media provides advertisers with personal connections, local impact

and national reach through broadcast and on-demand digital, mobile, social, and voice-activated

platforms, as well as integrated digital marketing services, powerful influencers, full-service audio

solutions, industry-leading research and insights, and live event experiences. Cumulus Media Inc.

is a Delaware corporation, organized in 2018, and the successor to a Delaware corporation with

the same name that was organized in 2002.[3]

### B.      The Radio Broadcasting Industry

19.      Radio broadcasting companies derive their primary revenue from the sale of

advertising time to local, regional, and national spot advertisers, and radio networks derive their

primary revenue from the sale of advertising time to national network advertisers.  Given the size

and variety of its audiences, and low advertising rates compared to many other media, radio is

considered an efficient, cost-effective means of reaching specifically identified demographic

---

[3]      Cumulus Media Inc.'s predecessor, CM Wind Down Topco Inc. (formerly known as Cumulus Media, Inc., "Old Cumulus"), and certain of its direct and indirect subsidiaries filed voluntary petitions for bankruptcy relief in November 2017 in the Bankruptcy Court for the Southern District of New York.  Old Cumulus and its debtor subsidiaries emerged from chapter 11 on June 4, 2018 and, prior to winding down its business, it transferred substantially all of its remaining assets to an indirect wholly owned subsidiary of reorganized Cumulus Media Inc.

groups at scale. Radio broadcasting companies and network radio companies also sell endorsements, where on-air talent serves as the voice for, and lends credibility to, a particular advertiser.

20.     Stations are typically classified by their on-air format, such as country, rock, adult contemporary, oldies and news/talk. A station's format and style of presentation allow it to attract specific listener segments sharing certain demographic features and therefore market its broadcasting time to advertisers seeking to reach that audience. Generally, content broadcast on a radio station is either generated locally or comes from a radio network, where such content is generated centrally and syndicated to that radio station. Advertisers and their agencies use data published by audience measuring services, such as Nielsen, to estimate how many people within particular geographical markets and demographics listen to specific stations.

21.     The format of a particular station and the competitive environment generally dictate the type and number of advertisements that a station can broadcast without jeopardizing listening levels and the resulting ratings. Although the number of advertisements broadcast during a given time period may vary, the total number of advertisements broadcast on a particular station generally does not vary significantly from year to year unless there is a specific strategy implemented to change that approach.

22.     A station's local sales staff generates the majority of its local and regional advertising sales through direct solicitations of advertising agencies and local businesses. To generate national advertising sales, a station usually will engage a firm that specializes in soliciting radio-advertising sales on a national level. Stations may also engage directly with an internal national sales team that supports the efforts of third-party sales representatives and generates new business. National network sales representatives generally sell spots that have been received as

payment for the syndication of content to a network affiliate or that have been otherwise acquired (e.g., purchased for cash).

23.     The Company has attempted to improve its competitive position with advertisers through its broad portfolio of offerings across various content platforms, including local stations, the Westwood One network, the Cumulus Podcast Network, the Company's leading U.S. streaming audio advertising network, and an array of local digital marketing services.   The Company has successfully extended content from one platform to another to build audiences and monetization opportunities.   The Company also provides a national platform which allows it to more effectively and efficiently compete for national and network advertising dollars.   The Company's high-quality broadcast and podcast programming and exclusive radio broadcast partnerships with the NFL and NCAA allow it to provide advertisers with national reach and the ability to create compelling campaigns from a local to a national level across broadcast, digital, and live event offerings.

### C.     Cumulus Media

#### 1.     Reportable Segments

24.     Cumulus Media has one operating and reportable segment.   The Company centralizes the management of its overall executive, administrative and support functions, including finance, accounting, legal, human resources, revenue management, marketing and information technology functions.

2.    **Revenue**

25.    The Company generates revenue across the following three major revenue streams:

a.    <u>Broadcast Radio Revenue</u>.

26.    Most of the Company's revenue is generated through the sale of terrestrial, broadcast radio spot advertising time to local, regional, and national clients.  Local spot and regional spot advertising is sold by Cumulus-employed sales personnel.  National spot advertising for the Company's owned and operated stations is marketed and sold by both the Company's internal national sales team and Katz Media Group, Inc. ("<u>Katz</u>") in an outsourced arrangement.

27.    In addition to local, regional and national spot advertising revenues, the Company monetizes its available inventory in the network sales marketplace.  To effectively deliver network advertising for its customers, the Company distributes content and programming through third party affiliates in order to reach a broader national audience.  Typically, in exchange for the right to broadcast radio network programming, third party affiliates remit a portion of their advertising time to the Company, which is then aggregated into packages focused on specific demographic groups and sold by the Company to its advertiser clients that want to reach those demographic groups on a national basis.  Network advertising airing across the Company's owned, operated, and affiliated stations is sold by the Company's internal sales team located across the United States to predominantly national and regional advertisers.

28.    The Company strives to maximize revenue by managing its on-air inventory of advertising time and adjusting prices based on supply and demand.  The optimal number of advertisements available for sale depends on the programming format of a particular radio program.  Each program has a general target level of on-air inventory available for advertising.  This target level of advertising inventory may vary at different times of the day but tends to remain

stable over time. The Company seeks to broaden its base of advertisers in each of its markets by providing a wide array of audience demographic segments across each cluster of stations, thereby providing potential advertisers with an effective means to reach a targeted demographic group. The Company's advertising contracts are generally short-term.

b. <u>Digital Revenue</u>.

29. Cumulus Media generates digital advertising revenue by offering digital marketing services and through the sale of advertising and promotional opportunities across its podcasting network, streaming audio network, websites, and mobile applications.  It sells premium advertising adjacent to, or embedded in, podcasts through its network of owned and distributed podcasts.  The Company also operates one of the largest streaming audio advertising networks in the United States, including owned and operated internet radio simulcasted stations with either digital ad inserted or simulcasted ads.  The Company sells display ads across 394 local radio station websites, mobile applications, and ancillary custom client microsites.  In addition, the Company sells an array of campaign-based local digital marketing services to new and existing advertisers, such as email marketing, geo-targeted display, video solutions, and search engine marketing, as well as subscription-based services such as website building and hosting, social media management, reputation management, listing management, and search engine optimization.

c. <u>Other Revenue</u>.

30. Other revenue includes trade and barter transactions, remote and event revenues, and non-advertising revenue.  Non-advertising revenue represents fees received for licensing network content, imputed tower rental income, satellite rental income, and proprietary software licensing.

3. **Advertising Sales**

13

31.     The Company's major advertiser categories are automotive, entertainment, financial, general services, home products, professional services, restaurants, retail, and telecommunications/media.  Each station's local sales staff solicits advertising, both broadcast and digital, either directly from a local advertiser or indirectly through an advertising agency.  When the Company's local sales account executives engage with local advertisers to help them grow their businesses, they sell a diversified product offering including broadcast radio and digital products.  The Company uses a tiered commission structure to focus its sales staff on new business development.

32.     Advertising sales to national spot advertisers for the Company's radio stations are made by Katz on the national level, in exchange for a commission that is based on the revenue from the advertising generated.  Regional sales, which the Company defines as sales in regions surrounding its markets to buyers that advertise in those markets, are generally made by the Company's local sales staff and market managers.  While the Company seeks to grow its local sales through more customer-focused sales staff, it seeks to grow its national and regional sales by offering key national and regional advertisers access to groups of stations within specific markets and regions that make it a more attractive platform.

33.     The Company's network sales team leverages scale, efficiency, and marquee name brand content to sell inventory directly to national advertisers and/or their advertising agencies across a wide spectrum of delivery platforms.  The Company's network sales team has the ability to aggregate advertising inventory time across the Company's owned and operated and/or affiliate networks to sell to national advertisers and are incented based on sales volume, new business development, and mix of inventory sold.

### 4.      Employees

34.      As of the Petition Date, Cumulus Media employed approximately 3,000 people, 2,000 of whom were employed full-time.  Of these employees, approximately 100 employees were covered by 8 collective bargaining agreements.   In order to protect its interests in valuable relationships and content, Cumulus Media enters into contracts with many of its on-air personalities and podcast hosts, including, in certain instances, contracts to syndicate their content on an exclusive, or semi-exclusive, basis.

### D.      Federal Regulation of Radio Broadcasting

35.      The ownership, operation and sale of radio broadcast stations, including those licensed to the Company, are subject to the jurisdiction of the Federal Communications Commission ("FCC"), which acts under authority of the Communications Act of 1934, as amended (the "Communications Act").  Among its other regulatory responsibilities, the FCC issues permits and licenses to construct and operate radio stations, assigns broadcast frequencies, determines whether to approve changes in ownership or control of station licenses, regulates transmission equipment, operating power, and other technical parameters of stations, adopts and implements regulations and policies that directly or indirectly affect the ownership, operation and employment practices of stations, regulates the content of some forms of radio broadcast programming, and has the authority under the Communications Act to impose penalties for violations of its rules.

### E.      Significant Ratings Materials and Advertising Sales Contracts

36.      The radio broadcast industry's principal ratings service is Nielsen, which publishes surveys for domestic radio markets.  Certain of the Company's subsidiaries have previously entered into agreements with Nielsen under which they received programming ratings information, though the renewal of such agreements is subject to pending litigation as described further below.

37.     The Company engages Katz as its national advertising sales agent.  The national advertising agency contract with Katz contains termination provisions that, if exercised by the Company during the term of the contract, would obligate the Company to pay a termination fee to Katz, based upon a formula set forth in the contract.

## II.     Prepetition Capital Structure

### A.     Corporate Structure

38.     The organizational chart attached hereto as **Exhibit B** depicts Cumulus Media's current corporate structure.

39.     Certain direct and indirect subsidiaries of Cumulus Media Inc. did not file for Chapter 11 relief, including (a) eight companies that hold FCC licenses (each FCC license, an "FCC License," and such non-debtor companies, the "Non-Debtor FCC License Holders") and (b) two companies that are designated as "Non-Significant Subsidiaries" under the Debtors' prepetition debt documents (collectively with the Non-Debtor FCC License Holders, the "Non-Debtor Entities").  None of the Non-Debtor Entities (i) conduct any material business operations, (ii) have any employees, (iii) are obligors on the Debtors' prepetition funded debt, or (iv) have pledged any assets in favor of the prepetition secured lenders.[4]

40.     The Debtors also own interests in various joint ventures and partnerships, none of which are Debtors.  Most of the joint ventures and partnerships were created for the purposes of owning and operating physical radio assets, such as towers, antenna systems, or combiner systems.

---

[4]     The Non-Debtor Entities are subsidiaries of certain Debtor entities, which Debtor parent entities have pledged their equity interests in the applicable Non-Debtor Entity subsidiaries as collateral under the ABL Credit Agreement, 2029 Credit Agreement, 2029 Notes Indenture, and, in the case of certain entities only, the 2026 Credit Agreement.

41.     In addition, the Debtors are beneficiaries of a trust that holds for divestiture certain radio assets with *de minimis* value in accordance with and pursuant to a Memorandum Opinion and Order released by the FCC. *See In the Matter of Citadel Broad. Co.*, 22 FCC Rcd 7083 (2007).

### B.     Prepetition Capital Structure

42.     As of the Petition Date, the Debtors have approximately $697.1 million in aggregate principal amount of funded debt obligations outstanding.   The following table summarizes the Debtors' funded indebtedness outstanding as of the Petition Date.[5]

| Agreement | Principal Amount Outstanding | Maturity Date |
|---|---|---|
| **Secured Funded Debt** | | |
| ABL Credit Agreement | $55,000,000[6] | March 1, 2029 |
| 2029 Term Loan Credit Agreement | $311,844,954 | May 2, 2029 |
| 2029 Notes Indenture | $306,375,000 | July 1, 2029 |
| 2026 Term Loan Credit Agreement | $1,202,709 | March 31, 2026 |
| **Unsecured Funded Debt** | | |
| 2026 Notes Indenture | $22,697,000 | July 1, 2026 |

### 1.     Funded Indebtedness

#### a.     ABL Facility

43.     Cumulus Media Intermediate Inc. ("Intermediate Holdings"), as guarantor, Cumulus Media New Holdings, Inc. ("Holdings") and certain of its subsidiaries, as borrowers, Fifth Third Bank, National Association, as administrative agent and collateral agent (in such capacity, the "ABL Agent") and lender, are party to that certain Credit Agreement dated as of March 6, 2020 (as amended, supplemented, amended and restated, or otherwise modified from time to time, including most recently on May 2, 2024, the "ABL Credit Agreement").   The ABL

---

[5]     The following description of the Debtors' funded indebtedness is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

[6]     This amount does not include approximately $5,000,000 in outstanding, undrawn letters of credit.

Credit Agreement provides for a senior secured asset-based revolving credit facility (the "ABL Facility", and the loans thereunder the "ABL Loans") in an aggregate amount of up to $125,000,000.  As of the Petition Date, approximately $55,000,000 in unpaid aggregate principal amount and approximately $5,000,000 in undrawn letters of credit are outstanding under the ABL Facility.  The ABL Facility matures on March 1, 2029.

44.    Availability under the ABL Facility is tied to a borrowing base equal to 85% of the accounts receivable of the borrowers, subject to customary reserves and eligibility criteria and reduced by outstanding letters of credit.  Under the ABL Facility, up to $15.0 million of availability may be drawn in the form of letters of credit and up to $10.0 million of availability may be drawn in the form of swing line loans.  Borrowings under the ABL Facility bear interest, at the option of Holdings, based on SOFR plus (i) a credit adjustment spread of 0.10% and (ii) an applicable margin of 1.00% or the Alternative Base Rate.  The Alternative Base Rate is defined, for any day, as the per annum rate equal to the rate identified as the "Prime Rate" by Fifth Third Bank, National Association.  In addition, the unused portion of the ABL Facility is subject to a commitment fee of 0.25%.

45.    Amounts outstanding under the ABL Facility are guaranteed by Intermediate Holdings and the present and future wholly-owned restricted subsidiaries of Intermediate Holdings that are not borrowers thereunder, subject to certain exceptions as set forth in the ABL Credit Agreement (the "ABL Guarantors").  The obligations under the ABL Facility are secured by a first-priority (with respect to the ABL Priority Collateral (as defined in the ABL Credit Agreement)) and third-priority (with respect to the Term Loan Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement (as defined below)) security interest in, subject to permitted liens and certain exceptions, substantially all of the assets of Holdings, the subsidiaries

of Holdings party to the ABL Credit Agreement as borrowers, and the ABL Guarantors (the "ABL Collateral"). Certain subsidiaries that are designated as unrestricted under the 2026 Term Loans Credit Agreement and the 2026 Notes Indenture are borrowers under the ABL Facility.

b.      2029 Term Loans

46.      As part of the 2024 Exchange Transactions (as defined below), Intermediate Holdings, Holdings and certain of its subsidiaries, as borrowers, Bank of America, N.A., as administrative agent (the "2029 Agent"), and the lenders from time to time party thereto entered into that certain Term Loan Credit Agreement, dated as of May 2, 2024 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "2029 Credit Agreement"). The 2029 Credit Agreement consists of a term loan facility (the "2029 Term Loans") maturing in May 2029. As of the Petition Date, approximately $311,844,954 in aggregate principal amount of 2029 Term Loan obligations is outstanding under the 2029 Credit Agreement.

47.      The 2029 Term Loans bear interest at a per annum rate equal to (i) SOFR, subject to a SOFR floor of 1.00%, and an applicable margin of 5.00%, or (ii) the Alternative Base Rate (as defined in the 2029 Credit Agreement) and an applicable margin of 4.00%. As of the Petition Date, the 2029 Term Loans bore interest at a rate of 8.901% per annum.

48.      The 2029 Term Loans are guaranteed by Intermediate Holdings and the present and future wholly-owned restricted subsidiaries of Intermediate Holdings that are not borrowers thereunder, subject to certain exceptions as set forth in the 2029 Credit Agreement (the "2029 Term Loan Guarantors"). The 2029 Term Loans are secured by first-priority (with respect to the Term Loan Priority Collateral) and second-priority (with respect to the ABL Priority Collateral) security interests in, subject to permitted liens and certain exceptions,

substantially all of the existing and future assets of Holdings, the subsidiaries of Holdings party to the 2029 Credit Agreement as borrowers, and the 2029 Term Loan Guarantors (the "2029 Collateral"). Certain subsidiaries that are designated as unrestricted under the 2026 Credit Agreement and the 2026 Notes Indenture are borrowers under the 2029 Credit Agreement.

c.    <u>2029 Notes</u>

49. As part of the 2024 Exchange Transaction, Holdings, as issuer, the guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee (the "2029 Trustee") entered into that certain Indenture, dated as of May 2, 2024 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "2029 Notes Indenture"). Pursuant to the 2029 Notes Indenture, Holdings issued $306,375,000 in aggregate principal amount of 8.00% senior secured first-lien notes due 2029 (the "2029 Notes") maturing on July 1, 2029. As of the Petition Date, $306,375,000 in aggregate principal amount of 2029 Notes are issued and outstanding under the 2029 Notes Indenture.

50. The 2029 Notes are fully and unconditionally guaranteed by Intermediate Holdings and the present and future wholly-owned restricted subsidiaries of Holdings, subject to the terms of the 2029 Notes Indenture (the "2029 Notes Guarantors"). Certain subsidiaries that are designated as unrestricted under the 2026 Credit Agreement and the 2026 Notes Indenture are 2029 Notes Guarantors. Other than certain assets that constitute ABL Priority Collateral (as to which the 2029 Notes are secured on a second-priority basis), the 2029 Notes are secured on a first-priority basis *pari passu* with the 2029 Term Loans (subject to certain exceptions) by liens on the 2029 Collateral.

d.    <u>2026 Term Loans</u>

20

51.     Intermediate Holdings, Holdings and certain of its subsidiaries, as borrowers, Bank of America, N.A., as administrative agent (the "2026 Agent") and the other banks and financial institutions party thereto are party to that certain Credit Agreement, dated as of September 26, 2019 (as amended, supplemented, amended and restated, or otherwise modified from time to time, including most recently on May 2, 2024, the "2026 Credit Agreement").  The 2026 Credit Agreement originally consisted of a $525 million senior secured term loan facility (the "2026 Term Loans") maturing on March 31, 2026.  As of the Petition Date, as a result of, among other things, the 2024 Exchange Transactions and the Company's repayment of certain of the 2026 Term Loans, approximately $1,202,709 in aggregate principal amount of 2026 Term Loans are outstanding under the 2026 Credit Agreement.

52.     Amounts outstanding under the 2026 Credit Agreement bear interest at a per annum rate equal to (i) SOFR plus a SOFR Adjustment, subject to a SOFR floor of 1.00%, and an applicable margin of 3.75%, or (ii) the Alternative Base Rate (as defined in the 2026 Credit Agreement).  As of the Petition Date, the 2026 Term Loans bore interest at a rate of 7.687% per annum.

53.     Amounts outstanding under the 2026 Credit Agreement are guaranteed by Intermediate Holdings and the present and future wholly-owned restricted subsidiaries of Holdings that are not borrowers thereunder, subject to certain exceptions as set forth in the 2026 Credit Agreement (the "2026 Term Loan Guarantors").  The 2026 Term Loans are secured by a security interest in substantially all of the assets of Holdings, the subsidiaries of Holdings party to the 2026 Credit Agreement as borrowers, and the 2026 Term Loan Guarantors (the "2026 Term Loan Collateral", and together with the ABL Collateral and the 2029 Collateral, the "Prepetition Collateral").  In connection with the 2024 Exchange Transactions, Holdings

obtained requisite consents from lenders of the 2026 Term Loans to amend the 2026 Credit Agreement to, among other things, subordinate the liens securing the 2026 Term Loans to the liens securing the 2029 Term Loan and the 2029 Notes pursuant to the Junior Lien Intercreditor Agreement (as defined below).

e.    <u>2026 Notes</u>

54.    Holdings, as issuer, the guarantors party thereto, U.S. Bank National Association, as trustee (the "<u>2026 Trustee</u>"), are party to that certain Indenture, dated as of June 26, 2019 (as amended, supplemented, amended and restated, or otherwise modified from time to time, including most recently on May 2, 2024, the "<u>2026 Notes Indenture</u>").  Pursuant to the 2026 Notes Indenture, Holdings issued $500,000,000 in aggregate principal amount of 6.75% senior notes due 2026 (the "<u>2026 Notes</u>") maturing July 1, 2026.  As of the Petition Date, as a result of, among other things, the 2024 Exchange Transactions and the Company's repayment of certain of the 2026 Notes, approximately $22,697,000 in aggregate principal amount of 2026 Notes are issued and outstanding under the 2026 Notes Indenture.

55.    The 2026 Notes are fully and unconditionally guaranteed by Intermediate Holdings and the present and future wholly-owned restricted subsidiaries of Holdings, subject to the terms of the 2026 Notes Indenture.  In connection with the 2024 Exchange Transactions, Holdings obtained requisite consents from holders of the 2026 Notes to amend the 2026 Notes Indenture to, among other things, release all the collateral securing the 2026 Notes.  As a result, the 2026 Notes are not secured by any liens on the Prepetition Collateral.

2.    <strong>Intercreditor Agreements</strong>

56.    The respective rights and interests of the lenders and noteholders under the ABL Credit Agreement, the 2029 Credit Agreement, the 2029 Notes Indenture, and the 2026 Credit

Agreement are governed by three intercreditor agreements, each dated May 2, 2024 (collectively, the "Intercreditor Agreements"): (a) that certain Amended and Restated ABL/Term Loan Intercreditor Agreement, dated as of May 2, 2024, by and among Intermediate Holdings, Holdings, the other grantors from time to time party thereto, the ABL Agent, the 2029 Agent, the 2029 Trustee, and the 2026 Agent (the "ABL/Term Loan Intercreditor Agreement"); (b) that certain First Lien Intercreditor Agreement, dated as of May 2, 2024, by and among Intermediate Holdings, Holdings and certain of its subsidiaries, the other grantors party thereto, the 2029 Agent, and the 2029 Trustee (the "Pari Passu Intercreditor Agreement"); and (c) that certain Junior Lien Intercreditor Agreement, dated as of May 2, 2024, by and among Intermediate Holdings, Holdings, the other grantors party thereto, the ABL Agent, the 2029 Agent, and the 2029 Trustee (the "Junior Lien Intercreditor Agreement").  Among other things, the Intercreditor Agreements set forth the parties' respective rights and interests relating to their rights in the Prepetition Collateral, their ability to exercise remedies in connection with an event of default, and the relative rights and obligations in the event of a chapter 11 filing by the Debtors, including various enforcement, standstill, turnover, and cash collateral and debtor-in-possession financing provisions.

57.      Pursuant to the Intercreditor Agreements: (i) the obligations under the ABL Credit Agreement are secured on a first-priority basis by liens on the ABL Priority Collateral (which generally consists of cash, accounts receivables, chattel paper, and related proceeds) and a third priority basis by liens on the Term Loan Priority Collateral (which generally consists of all Prepetition Collateral that is not ABL Priority Collateral); (ii) the obligations under the 2029 Credit Agreement are secured on a first-priority basis by liens on the Term Loan Priority Collateral and a second-priority basis by liens on the ABL Priority Collateral; (iii) the obligations under the 2029 Notes Indenture are secured on a first-priority basis *pari passu* with the 2029 Term Loans (subject

to certain exceptions) by liens on Term Loan Priority Collateral and on a second-priority basis *pari passu* with the 2029 Term Loans by liens on the ABL Priority Collateral; and (iv) the liens securing the obligations under the 2026 Credit Agreement are subordinated to the liens securing the obligations under the 2029 Credit Agreement and the 2029 Notes Indenture.

### 3.   Equity Interests

58.     Pursuant to its Charter, Cumulus Media Inc. is authorized to issue an aggregate of 300,000,000 shares of stock divided into three classes consisting of: (a) 100,000,000 shares of Class A common stock (b) 100,000,000 shares of Class B common stock; and (c) 100,000,000 shares of preferred stock.

59.     As of the Petition Date, Cumulus Media had the following issued and outstanding shares:

|  | Class A Common | Class B Common | Treasury Stock | Total |
|---|---|---|---|---|
| Issued | 22,943,154 | 312,041 | (5,815,111) | 17,440,084 |
| Outstanding | 17,128,043 | 312,041 | 0 | 17,440,084 |

As of the Petition Date, no shares of preferred stock are outstanding.

60.     Shares of Cumulus Media Inc.'s Class A common stock have historically traded on Nasdaq Global Market ("Nasdaq") under the symbol "CMLS".  However, trading was suspended on May 2, 2025 as part of Nasdaq's delisting procedures.  At the open of business on May 2, 2025, the Company's Class A common stock began trading on the OTC Markets' OTCQB® market tier. There is no established public trading market for Cumulus Media Inc.'s Class B common stock.

## III.   Events Leading to the Commencement of These Chapter 11 Cases

### A.   Declining Broadcast Industry and Macroeconomic Headwinds

61.     Following emergence from its prior chapter 11 cases in 2018, the Company pursued a plan to reposition its business for long-term success.  Despite successfully implementing many

aspects of that strategy, accelerating industry-wide declines in broadcast radio ultimately constrained the Company's efforts. Intensifying competition from digital audio and streaming platforms, a shift toward programmatic and performance-based ad buying, and the continuation of negative secular changes in listener behavior—including a growing preference for on demand digital audio (particularly among younger audiences) and widespread smartphone integration with in-car systems that facilitate streaming over AM/FM—have placed sustained industry-wide pressure on advertising demand and core broadcast revenues. That pressure has limited the Company's cash flow and reinvestment capacity. The industry has also experienced persistent, multi-year declines in broadcast radio listenership that were further exacerbated by COVID-19-related behavioral changes. A sharp drop in commuting activity during the pandemic reduced audiences in primetime segments, and hybrid work patterns continue to depress drivetime listening relative to historical norms. Despite some bounce-back in radio listenership driven by return-to-office trends, annual declines have persisted, and radio listenership remains well below pre-pandemic levels, particularly in the large markets where the Company operates.

62.    In parallel, the Debtors have been fighting macroeconomic and cyclical headwinds that contributed to volatility in advertiser spending, compounding the effects of competitive displacement by alternative media and technology channels. Billions in advertising budgets have been diverted away from traditional radio broadcasting and into digital platforms, driving down revenues across the industry and profitability. Persistent inflation increased wages, content and production costs, third-party services, and other expenses, while sharply higher benchmark interest rates elevated cash interest burdens and tightened credit availability.

### B.    Refinancing and Other Strategic Actions

63.     To address these challenges and preserve liquidity, the Debtors undertook a multi-year sequence of strategic and balance-sheet initiatives prior to the filing of these chapter 11 cases.   The Debtors' management team implemented recurring cost reductions and operating efficiencies, and maintained strict working capital discipline while refocusing investment on digital growth opportunities.   The Debtors reduced gross debt by approximately $630 million (roughly 50% from 2018 levels), supported by an asset-monetization program totaling approximately $510 million.   That program included sales of approximately $120 million of land no longer required for operations, approximately $180 million of non-strategic stations, and approximately $210 million of tower assets through selective divestitures structured to maintain market coverage and service continuity.   These steps were complemented by approximately $120 million of cash generated from operations and opportunistic refinancings that lowered interest expense and extended maturities.   Notwithstanding these actions, the impacts of persistent industry-wide pressure on core broadcast revenues outweighed the benefits of these initiatives, necessitating additional restructuring measures.

64.     In May 2024, to address near-term maturities and preserve liquidity, the Company consummated a series of exchange offers (the "2024 Exchange Transactions") in accordance with a transaction support agreement with an ad hoc group representing approximately 80% of the then-outstanding 2026 Notes and approximately 97% of the then-outstanding 2026 Term Loans. Pursuant to the 2024 Exchange Transactions: (a) approximately $328.3 million of the 2026 Term Loan was exchanged for approximately $311.8 million of new 2029 Term Loans, and (b) approximately $323.0 million of the 2026 Notes was exchanged for approximately $306.4 million of new 2029 Notes.   Following settlement of the 2024 Exchange Transactions on May 2, 2024, $1.2 million in principal amount of the 2026 Term Loan and $23.2 million principal amount

of the 2026 Notes remained outstanding.  The 2024 Exchange Transactions were offered to all holders of 2026 Term Loans and 2026 Notes, and approximately 97% of all holders of 2026 Term Loans and 94% of all holders of 2026 Notes participated in the exchanges.

65.     In connection with the exchanges, the Company obtained consents to amend the 2026 Credit Agreement and the 2026 Notes Indenture to eliminate substantially all restrictive covenants and certain events of default, release all collateral securing the 2026 Notes, and subordinate the liens securing the 2026 Term Loan to the liens securing the 2029 Term Loan and the 2029 Notes.  Concurrently, the Company amended its ABL Facility to extend its maturity to March 1, 2029 and increase aggregate commitments from $100 to $125 million.

66.     The 2024 Exchange Transactions provided the Company with necessary extensions of upcoming debt maturities. However, because certain holders elected not to participate, small "stub" amounts of the 2026 Term Loan and 2026 Notes remain outstanding.  Throughout 2024 and 2025, the Company made interest payments on the remaining 2026 Term Loans and 2026 Notes.

### C.     Ongoing Operational Challenges, Liquidity Pressures, and Market Decline

67.     The Company's operating results and liquidity continued to deteriorate following the 2024 Exchange Transactions.  Demand in both national and local markets remained weak relative to historic levels, which amplified the Company's sensitivity to macroeconomic conditions.  In 2024, industry-wide national and local advertising slowdowns intensified.  Despite the breathing room afforded by the 2024 Exchange Transactions, higher interest expense and inflationary cost pressures constrained liquidity and free cash flow.  The Company also continued to face restrictive debt covenants and structural limitations that, taken together with market

conditions, reduced financial and operational flexibility notwithstanding the prior amendments and exchanges.

68.     Throughout the second half of 2024 and 2025, the Debtors undertook additional actions to stabilize liquidity.  The Company executed additional fixed-cost reductions, streamlined legacy operations, and accelerated high-ROI digital initiatives, while intensifying working-capital discipline, renegotiating vendor arrangements where practicable, curtailing non-essential capital expenditures, and pursuing incremental monetization of non-core assets.  The Debtors also drew under the ABL Facility to preserve liquidity during periods of revenue volatility.  Despite these initiatives, continued industry-wide declines in radio advertising revenue, elevated interest burdens, high fixed-cost contracts, and the cumulative effect of long-term and significant industry listenership declines, and pandemic-era dislocations persisted, leading to mounting liquidity constraints.

### D.     Nielsen Litigation

69.     In October 2025, the Company commenced litigation against Nielsen challenging its network tying policy, which, as described above, conditions access to Nielsen's comprehensive national ratings product on the purchase of separate and uneconomic local ratings data that the Company does not want or need.  Access to comprehensive national ratings data is critical to Westwood One's ability to compete for national advertising because advertisers and agencies expect proposals supported by complete and consistent national data that is only available through Nielsen.  The tying policy therefore placed the Company in an untenable position: either assume substantially higher audience measurement costs by purchasing unwanted and uneconomic local ratings data, or lose access to the vital national ratings data altogether.  Either of these outcomes would have significant negative impacts on the Company.

70.     The Company successfully obtained a preliminary injunction in the Nielsen litigation on December 30, 2025.[7] Nielsen subsequently appealed, and on February 3, 2026, the U.S. Court of Appeals for the Second Circuit granted Nielsen's motion for a stay pending appeal, temporarily staying the preliminary injunction.  The stay restored uncertainty and subjected the Company to coercive pricing at a critical moment when 2026 advertising contracts were being negotiated, increasing the risk of losing advertising customers and overall market share. Further, the Company has been compelled to commit to devoting significant management time and legal expense to the dispute.  On February 2, 2026, Nielsen filed an answer and counterclaims in the underlying litigation against Cumulus.  The Nielsen litigation remains pending in the District Court for the Southern District of New York.

<strong>E.     Retention of Professionals</strong>

71.     In September 2025, the Company re-engaged Moelis & Company LLC ("<u>Moelis</u>"), as investment banker to help explore strategic alternatives.  In November and December, 2025, respectively, the Company retained each of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as restructuring counsel, and Alvarez & Marsal North America, LLC ("<u>A&M</u>"), as financial advisor, to assist with these efforts.  Together with the Company, the advisors analyzed the Company's capital structure, potential sources of liquidity, and available financial runway in order to address the Company's balance sheet and its ability to service its debt payments as they came due.

72.     Ultimately, in light of ongoing business challenges and the impacts of the Nielsen network tying policy, the Debtors determined that promptly commencing prepackaged chapter 11 cases supported by their key stakeholders would provide the best option to stabilize operations,

---

[7]     *See* Order on the Motion for Preliminary Injunction.  *Cumulus Media New Holdings Inc.* v. *The Nielsen Company (US) LLC*, No. 25-CV-08581 (JAV), ECF No. 132 (S.D.N.Y. Dec. 30, 2025).

protect customer relationships and going concern value, and comprehensively address the Company's over-levered capital structure.

### F.      Appointment of Independent Director and Investigation Committee

73.      In January 2026, the Board established a special investigation committee of the Board (the "Investigation Committee") and appointed Ms. Flaton, as an independent director and the sole member of the Investigation Committee. The Investigation Committee was delegated the sole and exclusive authority to conduct an independent investigation into any potential claims against the Debtors' insiders and equity holders, and whether any claims against insiders or equity holders should be pursued.

### G.      Stakeholder Engagement

74.      In the last quarter of 2025, the Debtors and their advisors entered into discussions with the Ad Hoc Group to explore a comprehensive restructuring of their indebtedness. In early 2026, the Debtors also commenced discussions with the ABL Agent. During this time, the Debtors have engaged in extensive discussions with the ABL Agent and the Ad Hoc Group regarding potential transactions.

### H.      Negotiations Regarding the Restructuring Support Agreement[8]

75.      Ultimately, on March 4, 2026, after extensive, arm's-length negotiations, the Debtors entered into the Restructuring Support Agreement with Consenting 2029 Holders (as defined therein) who hold, in the aggregate, approximately 72.05% of the 2029 Debt Claims. The Restructuring Support Agreement contemplates an in-court restructuring of the Debtors (the "Restructuring Transactions") to be implemented through prepackaged chapter 11 cases. The

---

[8]      Capitalized terms used but not defined in this section have the meanings set forth in the Restructuring Support Agreement.

Restructuring Transactions are set forth in the Restructuring Support Agreement and the term sheet attached thereto (the "Restructuring Term Sheet").[9]

76.     The Restructuring Support Agreement envisions a substantial deleveraging of the Debtors' balance sheet by approximately $592 million and a reduction of approximately $49 million in annual cash interest expense.   The delevered capital structure contemplated by the Restructuring Support Agreement will position the reorganized Debtors for potential strategic transactions in the consolidating radio broadcast industry following their emergence from these chapter 11 cases.   Pursuant to the Restructuring Support Agreement and subject to the conditions specified therein, the Consenting 2029 Holders have agreed, among other things, to support the Restructuring Transactions and vote in favor of the Plan.

77.     The Restructuring Support Agreement contemplates that the Debtors will achieve certain milestones (the "Milestones") over the course of the chapter 11 cases:

| Deadline | Milestone |
|---|---|
| March 4, 2026 | The Debtors shall launch solicitation of creditor acceptance of the Plan. |
| March 4, 2026 | The Petition Date shall take place. The Company Parties shall file the Plan, Disclosure Statement, Scheduling Motion, and the Cash Collateral Motion. |
| As soon as reasonably practicable after the Petition Date, but in any event no later than three days thereafter. | The Bankruptcy Court shall enter the Scheduling Order and the Interim Cash Collateral Order. |
| No later than 30 days after the Petition Date; provided that this deadline may be extended by the Company by up to 25 days if the purpose of such extension is solely to align the hearing on the Final Cash | The Bankruptcy Court shall enter the Final Cash Collateral Order. |

---

[9]     The following description of the Restructuring Transactions is for informational purposes only and is qualified in its entirety by reference to the Restructuring Support Agreement and the Restructuring Term Sheet.

| Deadline | Milestone |
| --- | --- |
| Collateral Order with the Confirmation hearing. | |
| No later than 55 days after the Petition Date. | The Bankruptcy Court shall enter the Confirmation Order. |
| As soon as practicable after entry of the Confirmation Order, but in any event no later than 75 days after entry of the Confirmation Order; *provided* that the Company may extend this deadline for up to an additional 120 days solely to the extent that the Company Parties have otherwise complied with the Restructuring Support Agreement, and all conditions to the Plan Effective Date have been satisfied other than (i) the receipt of required regulatory or other governmental approvals and (ii) any conditions that, by their nature, can only be satisfied on the Plan Effective Date. | The Plan Effective Date shall occur. |

78.     Given the substantial benefits of the Restructuring Transactions, I believe that the proposed Restructuring Transactions currently represent the best available path forward to right size the Debtors' balance sheet and position the Debtors for future success following these chapter 11 cases.  I further believe that reaching consensus on the Restructuring Transactions prior to commencing these chapter 11 cases was critical to ensuring a smooth landing in chapter 11 and providing the Debtors with a plan on which to build additional stakeholder support for the Debtors' restructuring, which will maximize the value of the Debtors' estates and their going concern business.  Moreover, I understand that the Debtors' obligations under the Restructuring Support Agreement are subject to a fiduciary out, thus ensuring that the Debtors are able to continue considering all unsolicited offers during these chapter 11 cases.

79.     On March 4, 2026, the Board established a special transaction committee (the "Transaction Committee") and disbanded its Restructuring Committee, in each case in accordance

with the terms of the Restructuring Support Agreement, and appointed Elizabeth Abrams, David Tolley, and Steven M. Galbraith as the initial members of the Transaction Committee. The Transaction Committee was authorized and delegated with authority to assess, review, provide input on negotiations of, and recommend to the full Board (i) any M&A Transactions or Asset Sales (as defined in the Restructuring Support Agreement and in each case, other than Permitted Transactions as defined in the Restructuring Support Agreement), (ii) the incurrence of professional fees and any professional fee budget, (iii) the entry into, termination or amendment of, material contracts, (iv) any additional and/or subsequent financing, and (v) any settlement or material change to the Company's current legal strategy with respect to any material litigation, (collectively, the "Transaction Committee Matters"). The Transaction Committee's consent is required in connection with the Transaction Committee Matters

### I. Negotiations Regarding the Use of Cash Collateral

80. While the Company was negotiating the terms of a comprehensive transaction with the Ad Hoc Group, it simultaneously engaged in discussions with the ABL Agent and the Ad Hoc Group regarding the consensual use of cash collateral during the pendency of these chapter 11 cases. Without access to cash collateral, the Debtors would not have the means to continue operating their businesses or fund the administrative costs of these chapter 11 cases. The Debtors sought to obtain the consent of the ABL Agent and Ad Hoc Group regarding the use of cash collateral to avoid a contested fight before this Court on that issue at the outset of the chapter 11 cases.

81. As set forth more fully in the Cash Collateral Motion, lenders constituting the requisite majority of ABL Loans, 2029 Term Loans, and 2029 Notes have agreed to the Company's consensual use of cash collateral in compliance with an approved initial budget

(the "Approved Budget"), subject to certain permitted variances, and the applicable milestones. The Debtors, with the assistance of their advisors, developed the initial Approved Budget governing the use of cash collateral in connection with negotiations with the ABL Agent and the Ad Hoc Group.   As reflected in the Approved Budget, as of the Petition Date, the Debtors collectively hold approximately $46 million of cash on hand.

82.   After taking into account the projected costs of the chapter 11 cases and anticipated revenues to be generated by the Debtors' ordinary course operations, I believe the use of cash collateral will allow the Debtors to continue to operate their businesses and administer these chapter 11 cases without having to seek debtor-in-possession financing at this time.  I believe this structure provides the Debtors with sufficient flexibility to continue to operate their businesses in the ordinary course and pursue a value-maximizing restructuring transaction.

83.   Without access to cash collateral as contemplated by the Cash Collateral Motion, I believe the Debtors' ability to operate their businesses on an uninterrupted basis and utilize the chapter 11 cases to pursue a value maximizing restructuring transaction would be immediately jeopardized.  Accordingly, I believe that the arrangement for the consensual use of cash collateral contemplated under the Cash Collateral Motion and related orders is in the best interests of the Debtors and their stakeholders.  The Debtors' consensual use of cash collateral in accordance with the Approved Budget provides it sufficient means to continue operations, implement a comprehensive restructuring transaction, fund the administrative costs of these chapter 11 cases, and avoid the cost, delay, and risk associated with a contested cash collateral dispute at the outset of these chapter 11 cases.  Because the Debtors' access to cash collateral is critical to their continued business operations and the success of these chapter 11 cases, I believe the relief

requested in the Cash Collateral Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by the Court.

**J.      ABL Commitment Letter**

84.     On March 4, 2026, the Debtors and the ABL Parties entered into the Exit ABL Commitment Letter, pursuant to which the ABL Parties have committed to enter into the Restated ABL Credit Agreement.  The Restated ABL Agreement will provide for a $100 million revolving credit facility on terms substantially similar to the Existing ABL Facility, subject to certain modifications as described in the ABL Commitment Letter.  Each holder of a claim under the existing ABL Facility has agreed to roll its claim under the Restated ABL Agreement.  The ABL Commitment Letter ensures the Debtors will have the financing needed to continue operations and execute on their business plan post-emergence.

**IV.      First Day Filings**

85.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring process.  The First Day Motions include:

**A.      Administrative Motions**

(i)      Notice of Designation as Complex Chapter 11 Bankruptcy Case ("Complex Case Designation");

(ii)      Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion");

(iii)      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) File a Consolidated List of the 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Waiving or Modifying the Requirement to File a List of Equity Security Holders; (III) Approving the Form and

35

Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; and (IV) Granting Related Relief ("Creditor Matrix Motion");

(iv)    Debtors' Emergency Motion for Entry of an Order (I) Establishing Procedures for Compliance With FCC Media and Foreign Ownership Requirements and (II) Granting Related Relief ("FCC Procedures Motion"); and

(v)     Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants, LLC (d/b/a Verita Global) as Claims, Noticing, and Solicitation Agent ("Claims Agent Retention Application").

## B.    Operational Motions Requesting Immediate Relief

(i)     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue Intercompany Transactions and (II) Granting Related Relief ("Cash Management Motion");

(ii)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief ("Wages Motion");

(iii)   Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor (A) Prepetition Claims and Obligations of On-Air Talent, (B) Station Compensation Obligations, and (C) Other Prepetition Trade Creditor Obligations and (II) Granting Related Relief ("All Trade Motion");

(iv)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief ("Taxes Motion");

(v)     Debtors' Emergency Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief ("Utilities Motion");

(vi) Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of Interests in and Claims Against the Debtors and (II) Granting Related Relief ("NOL Motion");

(vii) Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief ("Customer Programs Motion");

(viii) Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Workers' Compensation Insurance Obligations, (B) Continue, Renew, Supplement, Modify, Extend, or Purchase Insurance Coverage, (C) Pay Brokerage and Administrative Fees Related Thereto, and (D) Maintain Their Surety Bond Program, and (II) Granting Related Relief ("Insurance Motion"); and

(ix) Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection to Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief ("Cash Collateral Motion").

86.     The First Day Motions seek authority to, among other things, use cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to preserve the value of their enterprise and successfully implement their restructuring.

87.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored

their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

88.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

89.     For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these chapter 11 cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 5, 2026                    /s/ Francisco J. Lopez-Balboa
_____
                                         Francisco J. Lopez-Balboa
                                         Executive Vice President and Chief Financial
                                         Officer
                                         Cumulus Media Inc.