**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CUMULUS MEDIA INC., *et al.*[1] | ) Case No. 26-90346 |
| | ) |
| Debtor(s). | ) (Jointly Administered) |
| | ) |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CUMULUS MEDIA INC. AND ITS DEBTOR AFFILIATES**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee"), by and through the undersigned counsel, files this his Objection to confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates* (the "Plan") [ECF No. 20]. In support of his objection, the U.S. Trustee states as follows:

## INTRODUCTION

1.       In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216–27 (2024) ("*Purdue*"), the United States Supreme Court was unequivocal that, except in asbestos cases, chapter 11 plans may not include nonconsensual releases of claims against non-debtor third parties. The Supreme Court held that bankruptcy courts cannot involuntarily alter the relationships between non-debtors by imposing releases of claims between them. *Purdue*, 603 U.S. at 209, 227. Cumulus Media, Inc. and its affiliated debtors (the "Debtors") present this Court with an unconfirmable plan that

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims, noticing, and solicitation agent at www.veritaglobal.net/cumulusmedia. The Debtors' service address for purposes of these chapter 11 cases is: 780 Johnson Ferry Road, N.E., Suite 500, Atlanta, Georgia 30342.

imposes releases on non-debtor third parties without their affirmative and voluntary consent. As drafted, the Plan would bind unsecured creditors who are not entitled to vote under the Plan, unless those creditors take timely action to opt out. Compounding this issue, the third-party releases extend to an indeterminate number of unidentified parties, making it even more difficult for creditors to understand the scope of the releases and the identities of those being released. Specifically, the U.S. Trustee objects for the following reasons:

a. The Bankruptcy Code does not authorize the nonconsensual release of non-debtor third parties by other non-debtor third parties;

b. The Debtors' proposed opt out provisions in the Ballots and the Non-Voting Notices[2] are ineffective to confer affirmative consent to the Third-Party Releases; and

c. The Plan should expressly state that it does not release claims asserted by governmental entities acting under their police and regulatory authority.

### BACKGROUND

**A.      General Background**

2.      On March 5, 2026, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases are jointly administered.

3.      On March 5, 2026, the Debtors also filed a Plan and Disclosure Statement. *See* ECF Nos. 20 and 21.

4.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.      On March 5, 2026, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of the Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner*

---

[2] Capitalized terms are given the same meaning as in the Plan or later defined below.

*of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to the Disclosure Statement and Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief.* ECF No. 62.

### B.  Solicitation and Opt-Out Notices

6.  The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Facility Claims | Impaired | Entitled to Vote |
| Class 4 | 2029 Secured Claims | Impaired | Entitled to Vote |
| Class 5 | Other Funded Debt Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 9 | Existing Equity Interests and 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject |

7.  The Debtors transmitted a "Notice of Non-Voting Status" to Classes 1, 2, and 6 with the Release Opt Out Form. With respect to Class 9, the Debtors transmitted a "Notice of Non-Voting Status" and a Release Opt In Form. Under this procedure, general unsecured creditors who are not entitled to vote on the plan, are required to return an opt out form.

8.      Article I of the Plan defines the terms  "Released Party," and "Releasing Party,"

as follows:

"Released Parties" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) the Ad Hoc Group; (e) the 2029 Agent; (f) the 2029 Trustee; (g) the ABL Parties; (h) all Holders of Claims and Interests in Class 9 (Existing Equity Interests and 510(b) Claims) that affirmatively elect to "opt in" to the releases set forth in Article VIII.D of the Plan by checking the box on the Release Opt In Form indicating that they elect to grant the releases provided in the Plan; (i) all Holders of Claims in the Opt Out Classes that abstain from voting on the Plan, vote to accept or reject the Plan, or are presumed to accept the Plan (as applicable) and, in each case, who do not affirmatively opt out of the releases set forth in Article VIII.D of the Plan by checking the box on the applicable ballot or Release Opt Out Form (as applicable) indicating that they opt not to grant the releases provided in the Plan; (j) with respect to each of the foregoing Entities in clauses (a) through (i), each such Entity's current and former Affiliates; (k) with respect to each of the Entities in the foregoing clauses (a) through (j), each such Entity's current and former predecessors, participants, successors, assigns, subsidiaries, direct and indirect equityholders, interest holders, limited partners, co-investors, funds (including affiliated investment funds or investment vehicles), portfolio companies, and management companies; and (l) with respect to each of the Entities in the foregoing clauses (a) through (k), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; provided that, in each case, an Entity shall not be a Released Party if it (x) elects to opt out of the releases contained in the Plan, if permitted to opt out, or (y) does not elect to opt in to the releases contained in the Plan, if required to opt in

"Releasing Parties" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) the Ad Hoc Group; (e) the 2029 Agent; (f) the 2029 Trustee; (g) the ABL Parties; (h) all Holders of Claims and Interests in Class 9 (Existing Equity Interests and 510(b) Claims) that affirmatively elect to "opt in" to the releases set forth in Article VIII.D of the Plan by checking the box on the Release Opt In Form indicating that they elect to grant the releases provided in the Plan; (i) all Holders of Claims in the Opt Out Classes that abstain from voting on the Plan, vote to accept or reject the Plan or are presumed to accept the Plan (as applicable) and, in each case, who do not affirmatively opt out of the releases set forth in Article VIII.D of the Plan by checking the box on the applicable ballot or Release Opt Out Form (as applicable) indicating that they opt not to grant the releases provided in the Plan; (j) with respect

4

to each of the foregoing Entities in clauses (a) through (i), each such Entity's current and former Affiliates; (k) with respect to each of the Entities in the foregoing clauses (a) through (j), each such Entity's current and former predecessors, participants, successors, assigns, subsidiaries, direct and indirect equity holders, interest holders, limited partners, co-investors, funds (including affiliated investment funds or investment vehicles), portfolio companies, and management companies; and (m) with respect to each of the Entities in the foregoing clauses (a) through (k), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), management companies, fund advisors, investment advisors, advisory board members, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; provided that, in each case, an Entity shall not be a Releasing Party if it (x) elects to opt out of the releases contained in the Plan, if permitted to opt out, or (y) does not elect to opt in to the releases contained in the Plan, if required to opt in.

9.      Based on the definition of "Releasing Parties," the Plan would impose third-party releases on all those who do not opt-out of the releases by responding Ballot or the Non-Voting Notice. Specifically, the Plan will impose the third-party releases on all holders of claims who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) are deemed to accept or reject the Plan; or (iv) abstain from voting on the Plan, unless they exercise the opt-out or timely object to the releases in the Plan and such objection is not resolved before the confirmation hearing. For Class 9, the procedures allow holders of claims in that class to opt in, which the U.S. Trustee does not oppose.

## OBJECTION

**Statutory Standard**

10.     Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a chapter 11 plan. Among other things, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129. *In re Cypresswood Land Partners*, I, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009).

11. The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129. *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009).

### A. The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases.

12. Nonconsensual third-party releases are not authorized under the Bankruptcy Code. *Purdue*, 603 U.S. at 216–27. This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

13. The Court in *Purdue* did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

14. A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right of non-debtors.

15. For the reasons discussed below, a creditor's failure to check an opt-out box on a ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in some cases in the Southern District of

Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible. As explained below, state contract law should govern whether non-debtors have agreed to a release. There is no federal law that preempts the requirements of state contract law for such releases.

16.     Here, there is no existing release agreement between non-debtors. Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under non-bankruptcy law.

**B.      State Contract Law Applies**

17.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).[3]

18.     The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions

---

[3] For example, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

"unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

19. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. No Bankruptcy Code provision preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). No Bankruptcy Code provision (or other federal statute) defines when non-debtors have contracted to release claims against each other. Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. And "[t] here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).

20. Although the court in *In re Container Store Grp., Inc.*, No. BR 24-90627, 2026 WL 395898 (S.D. Tex. Feb. 12, 2026), and other courts that have held that federal rather than state law applies to determine whether a third-party release is consensual have cited general, catch-all Bankruptcy Code provisions, those courts have not located a specific Bankruptcy Code

provision addressing the issue.   *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code) ; *but see In re GOL Linhas Aéreas Inteligentes S.A.*, No. 25cv4610, 2025 WL 3456675 at *5 (S.D.N.Y. Dec. 1, 2025)(holding that "it is not necessary to decide whether federal or state law controls" because both apply "the same general principles of contract law," which "indicate that the third-party releases at issue here are nonconsensual" and rejecting other sources of federal law.).

21.     Absent express authority in the Bankruptcy Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.[4] Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."   *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).

22.     Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453,

---

[4] Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct."  *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).

458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

23.     Despite this precedent, the court in *Container Store* found that federal common law should apply rather than state law. But, to quote the Supreme Court: "Should federal courts rely on state law, together with any applicable federal rules, or should they devise their own federal common law test? To ask the question is nearly to answer it." *Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020). That is because "[t]he cases in which federal courts may engage in common lawmaking are few and far between." *Id*.

24.     "[B]efore federal judges may claim a new area for common lawmaking, strict conditions must be satisfied." *Rodriguez*, 589 U.S. at 136. The "few and restricted" instances when courts may do so "fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests and those in which Congress has given the courts the power to develop substantive law." *Texas Indus., Inc, v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (cleaned up).

25.     "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (cleaned up) (holding there is no federal common law governing standard of care owed by directors of federally chartered bank).  Congress has not granted courts the power to create substantive federal law regarding when non-debtors have given up their property rights in state-law claims against other non-debtors.  As noted above, there is no Bankruptcy Code provision that confers this power.

26.     That leaves the "most basic" of the conditions for federal common lawmaking: it "must be necessary to protect uniquely federal interests." *Rodriguez*, 589 U.S. at 136 (cleaned up); *accord Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 116 (2022) ("Judicial creation of federal common law to displace state-created rules must be 'necessary to protect uniquely federal interests.'") (quoting *Texas Indus.*, 451 U.S. at 640).  "[A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Indus.*, 451 U.S. at 641; *accord Atherton*, 519 U.S. at 218 ("[W]hen courts decide to fashion rules of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law must first be specifically shown.") (cleaned up).  "In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641 (holding

courts may not create federal common law right of contribution for defendants held liable on federal antitrust claims).

27.      The *Container Store* court asserted that "[u]nique federal interests compel the application of a federal, not state, rule of decision" to the question whether non- debtors have agreed to release state-law claims.  2026 WL 395898, at *9; *see also id.* at *14 (citing the 'strong federal interest' in applying a 'uniform federal rule,' to judgments that terminate cases" in bankruptcy).  But no such "uniquely federal interest" exists here.  *See Rodriguez*, 589 U.S. at 136; *Texas Indus.*, 451 U.S. at 640.  Indeed, the Fifth Circuit has recognized, that "although bankruptcy might seem to be a 'uniquely federal interest,' . . . 'the existence of congressional authority under Art. I [does not] mean that federal courts are free to develop a common law to govern those areas until Congress acts.'" *Matter of Walker*, 51 F.3d 562, 567 (5th Cir. 1995) (quoting *Texas Indus*, 451 U.S. at 641. Whether a non-debtor has agreed to release state-law claims against another non-debtor does not concern the rights and obligations of the United States or involve interstate or international relations.  To the contrary, state law is "well equipped" to handle disputes about property rights.  *Rodriguez*, 589 U.S. at 137.  That a property-rights question arises "in the context of a federal bankruptcy . . . doesn't change much." *Rodriguez*, 589 U.S. at 137.  "As [the Supreme] Court has long recognized, 'Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" [5] *Rodriguez*, 589 U.S. at 137 (quoting *Butner*, 440 U.S. at 54).  That is even more true for property rights in claims belonging to non-debtors. As the

---

[5] Indeed, bankruptcy court routinely apply state law.  *See, e.g., Little Hearts Marks Family II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC)*, No. 23-1202, 2025 WL 678645, at *4 (2d Cir. 2025) (applying state law to determine whether legal claims belonged to the bankruptcy estate or the creditor that sought to assert them in post-petition proceeding); *Spyglass Media Group, LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*, 997 F.3d 497, 504 (3d Cir. 2021) (applying "relevant state law governing the contract" to determine if a contract is executory).

Supreme Court held in *Purdue*, the Bankruptcy Code does authorize bankruptcy courts to extinguish those rights.

28.     The *Container Store* court relied on two theories to conclude that federal law, rather than state contract law, applied to the "question of whether claimants have 'consented' to third-party releases contained in a bankruptcy reorganization plan." *Container Store Grp.*, 2026 WL 395898, at *9.  Both the court's theories are unsupported.

29.     First, *Container Store* relied on "the Bankruptcy Code via § 1123(b)(6) and § 105(a), which grant statutory authority to bankruptcy courts over the provisions they may include in a reorganization plan."  *Id.*  Primarily, the court relied on the language of section 1123(b)(6)— that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title"—to conclude that the "bankruptcy court's authority to enter consensual releases follows from the Code's text and structure."  *Id.* at *11.  But whether a court can include a consensual release in a plan does not answer the question of whether state or federal law determines whether a claimant has consented to the release.  Although a plan can memorialize a consensual release, the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  *See Raleigh*, 530 U.S. at 20 ("The basic federal rule in bankruptcy is that state law governs the substance of claims.").  Indeed, the court did not even engage or cite *Continental Airlines Corp. v. Air Line Pilots Ass'n, Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508-10 (5th Cir. 1990), in which case the Fifth Circuit rejected the argument that asking a bankruptcy court to bless a settlement transforms a state-law issue into a matter of federal bankruptcy law. In *Continental*, the Fifth Circuit held that when reviewing a settlement with the debtor, bankruptcy courts have no power to impose settlement terms that "are unrelated to substantive provisions of the Bankruptcy Code."  *Id*. at 1508-09. Because "the settlement itself is

13

the source of the bankruptcy court's authority," the court lacked authority "to impose conditions that were not agreed to by the parties" that a federal court could not have imposed outside of bankruptcy. *Id*. at 1508-1510.

30. Further, the court's reliance on 1123(b)(6) cannot be reconciled with the Supreme Court's holding in *Purdue*, which precludes using section 1123(b)(6) to displace otherwise applicable state law because it held that section 1123(b)(6)'s catchall must be interpreted in line with its preceding paragraphs, all of which concern the debtor. *Purdue*, 603 U.S. at 218 ("When Congress authorized 'appropriate' plan provisions in paragraph (6), it did so only after enumerating five specific sorts of provisions, all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors.") (emphasis in original). Section 1123(b)(6) does not confer on bankruptcy courts "radically different power[s]," *id*., like imposing a release between non-debtors that would not be valid under otherwise applicable state law.[6]

31. In further support of its Bankruptcy Code based reasoning, the court suggested that because creditors "who agree to a settlement under" section 1123(a)(4) "are considered unimpaired," "it raises questions of federal law" of "what it means to 'agree.'" *Id.* at *11 (citing *In re Hanish, LLC*, 570 B.R. 4, 20 (Bankr. D.N.H. 2017) ("[A]n agreement to less favorable treatment under 11 U.S.C. § 1123(a)(4) does not create an impairment, it removes one.")). But section 1123 provides for a chapter 11 plan's allocation of estate assets to pay claims and interests against the debtor. *See* 11 U.S.C. § 1123. The court mistakenly equated agreement to a claim's

---

[6] In holding that section 1123(b)(6) confers the power to alter claims between non-debtors, the court also relied on the *United States v. Energy Resources Co.*, 495 U.S. 545 (1990). The *Purdue* dissent likewise made an argument that "*Energy Resources* . . . demonstrates that plan provisions under § 1123(b)(6) can affect creditor–non-debtor relationships." *Purdue*, 603 U.S. at 266 (Kavanaugh, J., dissenting). But the dissents discussion of section 1123(b)(6) is not law. *See*, *e.g.*, *Office of the United States Trustee v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 502 n.3 (2024) ("Readers are reminded that the dissent is just that."). Further, *Energy Resources* did not hold that section 1123(b)(6) authorizes courts to displace state law applicable to agreements between non-debtors. It expressly stated that it grants "authority to modify *creditor-debtor* relationships." 495 U.S. at 549 (emphasis added).

treatment in the plan with acceptance of proposed third-party releases, which are distinct legal constructs involving distinct parties: the Plan disposes of a creditor's claims against the debtor, while a third-party release disposes of a non-debtor's right to sue other non-debtors. Agreement "to less favorable treatment" to a claim against the debtor does not suggest federal law should govern the question of whether a creditor has consented to release a claim against a third-party non-debtor.

32.     Second, *Container Store* concluded that the "basis for applying federal law" to the consent question "is the inherent authority of federal courts to enter consent decrees in cases arising in equity within their subject-matter jurisdiction." *Container Store*, 2026 WL 395898, at *9. After a discussion of the general power of federal courts to enter consent decrees, the court concludes that there "is a 'strong federal interest' in determining whether claimants have consented to a reorganization plan that is based on the Code and on its equitable authority to approve a consent decree." *Id.* at *14. But even if a consent decree was an apt analogy for applying federal law to the issue of consent to a third-party release in a bankruptcy plan—which it is not— a consent decree is "founded on the agreement of the parties" to the litigation. *United States v. City of Miami, Fla.*, 664 F.2d 435, 439 (5th Cir. 1981); *see also Dunn v. Carey*, 808 F.2d 555, 559 (7th Cir. 1986) (recognizing a consent decree's "force comes from the agreement of the parties, not from the statute on which the complaint was based."). The court fails to explain why under federal law a consent decree could be entered based on the silence or in action of a party to the litigation.

33.     As a federal district court recently held, even if federal law applied, however, it would not lead to a different result. *See In re GOL Linhas Aéreas Inteligentes S.A.*, No. 25cv4610, 2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025). In reversing the bankruptcy court's decision to approve third-party releases based on opt-outs, the district court held that "it is not necessary to

15

decide whether federal or state law controls" because both apply "the same general principles of contract law," which "indicate that the third-party releases at issue here are nonconsensual." *Id.* at \*5.   Other courts agree that "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).   The *GOL* court also rejected the debtors' arguments based on non-contract federal law. *In re GOL Linhas Aéreas Inteligentes S.A.*, No. 25cv4610, 2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025).   It held that "even assuming the creditors here consented to the bankruptcy court's adjudication, it does not follow" that they "necessarily consent[ed] to any release the court may approve." *Id.* at \*6.  It further held that "[t]he opt-out mechanism utilized in the class action context simply does not apply to the third-party release here." *Id*.  And it rejected an analogy to default judgments because "the creditors had no duty to respond to the opt-out opportunity, and courts do not enter default judgments when parties have no duty to respond." *Id*.

34.      In analyzing whether the third-party releases in the Plan are permissible, the Court should determine whether there is consent under state law. Here, the Debtors' use of the opt-out mechanism is insufficient for this Court to make a finding of consent, which is fatal to the confirmation of the Plan.

**C.      Failing to Opt Out Does Not Provide the Required Affirmative Consent.**

35.      Debtors' plan imposes a third-party release on all holders of claims who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) are deemed to accept or reject the Plan; or (iv)

abstain from voting on the Plan, unless they exercise the opt-out or timely object to the releases in the Plan and such objection is not resolved before the confirmation hearing. In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But, as two federal district courts have held, under black-letter law silence is not acceptance of the offer to release non-debtors. *See, e.g.*, *GOL*, 2025 WL 3456675 at *5 (holding that the debtors had failed to establish that the third-party releases based on opt outs were consensual under state law, because state contract laws do not recognize silence as consent and creditors had no duty to respond to the opt-out or make any contemporaneous agreement.); *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

36. The Ninth Circuit's decision in *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), where the court held that a failure to opt out did not constitute consent to an arbitration agreement, is illustrative. There, a consumer purchased a Samsung phone that came with a warranty agreement containing an arbitration provision from which the consumer had the ability to opt out. *Norcia*, 845 F.3d at 1282. Although the consumer did not opt out, the court held he had not accepted Samsung's offer to arbitrate disputes. *Id.* at 1284. It concluded that no exceptions to the "general rule" that "silence or inaction does not constitute acceptance of an offer" applied. *Id.* There was no state-law duty to respond to the offer, the parties had no prior course of dealing that might impose such a duty, and the customer

17

did not retain any benefits by failing to act given that the warranty applied even if he opted out of arbitration. *Id*. at 1286.

37. Here, too, Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors. This court should reject *Container Store* and join the two other federal district courts to consider the matter and hold that releases forced upon creditors if they do not opt out of them are not consensual. *GOL*, 2025 WL 3456675 at *5; *Patterson*, 636 B.R. at 688.

**D.** **Not Voting and Not Opting Out is Not Consent to Release Non-Debtors.**

38. There is no basis to infer consent to third-party releases by those who do not vote— or take any action—on the plan and also do not check an opt-out box relating to third-party releases. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). 442 B.R. 314, 355 (Bankr. D. Del. 2011).

39. As to those who cannot vote because they are deemed to reject, the *Container Store* court[7] held that the bankruptcy court erred in concluding that holders of classes of claims that consisted of subordinated-claim holders and equity holders, respectively, who were not entitled to vote and received no recovery under the plan consented to third-party releases merely by failing to opt out. *Id.* at *20. The district court emphasized that "[c]ourts consistently avoid applying releases to claimants who received nothing under a reorganization plan" and that classes of equity holders who received little or nothing from the bankruptcy did not consent to the third-

---

[7] The court otherwise approved opt outs for certain classes of creditors based on its conclusion that federal law applied, s*ee supra at* 9, and the facts and circumstances of the case before it. The U.S. Trustee continues to maintain that opt outs cannot be consent for any class of creditors as described herein.

party release by failing to opt out. *Id.* (citing *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019)).

40.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. In approving opt out release procedures, the *Container Store* court paradoxically stated that "[a]lthough it may be unreasonable to impose on creditors an unequivocal duty to speak up—such that opt-outs under any condition are acceptable—it is often 'reasonable' to assume that the creditor "should notify [the bankruptcy parties] if he does not intend to accept, because everyone else is relying on him." *Container Store*, 2026 WL 395898, at *18. But other than vague assertions that the reorganization plans are achieved through "hard-fought negotiation by the interested parties" and "require substantial consent to the third-party releases for the plan's success" the court failed to explain why it is a reasonable to assume anything from a creditors silence. Indeed, creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *GOL*, 2025 WL 3456675 at *6 (concluding that it was "undisputed that the creditors had no duty to respond to the opt-out opportunity") *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

41.     The *Container Store* court's reliance on the illustration from the Restatement is misplaced:

> (2) A offers by mail to sell to B a horse already in B's possession for $250, saying: "I am so sure that you will accept that you need not trouble to write me. Your silence alone will operate as acceptance." B makes no reply, but he does not intend to accept. There is no contract.
>
> (4) The facts being otherwise as stated in Illustration 2, B makes no reply and remains inactive with the intention of thereby expressing his acceptance. There is a contract.

*Container Store*, 2026 WL 395898, at *17 (citing Restatement (Second) of Contracts cmt. c, illus. 2, 4.)

42.     But the court failed to acknowledge the Restatement's comment related to this illustration that "the offeree is entitled to rely on such a statement [by the offeror] if he chooses" but "the offeror who has invited such an acceptance cannot complain of the resulting uncertainty in his position." Restatement (Second) of Contracts § 69 cmt. c. Inferring consent from failure to opt out of a third party release places the burden of uncertainty from silence on the offeree instead of the offeror. Here, it is the Debtors that bear the burden of proving the plan is confirmable, including that the third-party release is consensual.

43.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must return to avoid being bound by the third-party release.

44.      "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

45.      Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

**E.      Voting on a Plan Plus a Failure to Opt Out Does Not Manifest Consent to a Non-Debtor.**

46.      Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with

21

respect to the offer to release claims against non-debtors. *See GOL*, 2025 WL 3456675 at *5 (reversing bankruptcy court approval of plan with opt-out nonconsensual releases for voting and non-voting parties, recognizing that "creditors had no duty to respond to the opt-out opportunity".). The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

47.      Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

**F.      Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.**

48.      Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[8] *See,*

---

[8] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id*. at *9-*10, *12-*13.

*e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex. 2024) (citing *Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *6-8).  These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

49.    This is wrong.  First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling.  Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right.  *United States v. Olano*, 507 U.S. 725, 731 (1993).  Forfeiture, unlike waiver, is not an intentional relinquishment of a known right.  *Id*. at 733.  *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").  Forfeiture principles thus do not show consent.

50.    Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan.  No one has

23

submitted the released claims for adjudication by the bankruptcy court.  *See Olano*, 507 U.S. at 731.

51.     And "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.[9] *Smallhold*, 665 B.R. at 709; *see also id.* at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up); *In re Gol Linhas Aéreas Inteligentes S.A.,* 2025 WL 3456675 *6 (S.D.N.Y. 2025) ("Further, it is undisputed that the creditors had no duty to respond to the opt-out opportunity, and courts do not enter default judgments when parties have no duty to respond.").

52.     But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Smallhold*, 665 B.R. at 709.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment."  *Id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors

---

[9] As discussed above, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at 719-20.

53.      Because a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at 709.  And besides the flawed default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[10]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at 720 (emphasis added).

### G.      The Plan Should Clarify that Claims of Government Entities Are Not Released Under the Third-Party Releases and Exculpation Provisions.

54.      The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015).

55.      The Debtors should modify the Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters. The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the

---

[10] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id*. at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## CONCLUSION

56.     The Court should deny confirmation of the Plan because it will impermissibly impose third-party releases on parties who have not affirmatively and unambiguously consent to third-party releases  that are in violation of the Bankruptcy Code. The Plan is unconfirmable because it runs afoul of *Purdue* and the Bankruptcy Code. Thus, the confirmation of the Plan should be denied.

Dated: April 7, 2026

<div style="margin-left:40%">

Respectfully submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7, SOUTHERN and WESTERN
DISTRICTS OF TEXAS

By:     */s/ Ha M. Nguyen*
        Ha M. Nguyen
        Trial Attorney
        CA State Bar No. 305411
        515 Rusk, Suite 3516
        Houston, Texas 77002
        Telephone: (713) 718-4650
        Fax: (713) 718-4670
        Ha.nguyen@usdoj.gov

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by electronic means on all PACER participants on April 7, 2026

<div style="text-align:center">

*/s/ Ha M. Nguyen*
Ha M. Nguyen

</div>